1
2
3
4
5
6

O

7          UNITED STATES DISTRICT COURT

8          CENTRAL DISTRICT OF CALIFORNIA

9

10   REGINA A. NETTLES,            ) Case No. CV 12-9670-JPR
                                   )
11                  Plaintiff,     )
                                   ) MEMORANDUM OPINION AND ORDER
12          vs.                    ) AFFIRMING THE COMMISSIONER
                                   )
13   CAROLYN W. COLVIN,            )
     Acting Commissioner of        )
14   Social Security,[1]           )
                                   )
15                  Defendant.     )
                                   )
16   ─────────────────────────────

17   **I.   PROCEEDINGS**

18        Plaintiff seeks review of the Commissioner's final decision

19   denying her application for Social Security Supplemental Security

20   Income benefits ("SSI").  The parties consented to the

21   jurisdiction of the undersigned U.S. Magistrate Judge pursuant to

22   28 U.S.C. § 636(c).  This matter is before the Court on the

23   parties' Joint Stipulation, filed September 6, 2013, which the

24   Court has taken under submission without oral argument.  For the

25

26   ─────────────────────

27        [1]    On February 14, 2013, Colvin became the Acting
     Commissioner of Social Security.  Pursuant to Federal Rule of
28   Civil Procedure 25(d), the Court therefore substitutes Colvin for
     Michael J. Astrue as the proper Respondent.

                                   1

reasons stated below, the Commissioner's decision is affirmed and this action is dismissed.

## II. BACKGROUND

Plaintiff was born on January 20, 1960. (AR 41-42.) She completed the 12th grade. (AR 42, 144.) Plaintiff previously worked as a home-care attendant and cafeteria worker. (AR 42-44, 56-57.)

On July 29, 2009, Plaintiff filed an application for SSI, alleging that she had been disabled since December 1, 1996, because of arthritis, depression, paranoia, insomnia, and asthma.[2] (AR 64, 117-23, 137.) After Plaintiff's application was denied, she requested a hearing before an Administrative Law Judge. (AR 72-74.) A hearing was held on October 25, 2010, at which Plaintiff, who was represented by counsel, and a vocational expert ("VE") testified. (AR 37-63.) In a written decision dated March 16, 2011, the ALJ determined that Plaintiff was not disabled. (AR 25-33.)

On April 26, 2011, Plaintiff requested that the Appeals Council review the ALJ's decision. (AR 19.) On September 21, 2011, Plaintiff submitted additional medical records to the Appeals Council. (AR 310-29.) On August 23, 2012, after

---

[2] The parties assert that Plaintiff "filed applications for a period of disability, disability insurance benefits, and supplemental security income" (J. Stip. at 2), but the file contains an application only for SSI (see AR 117-23) and the ALJ's decision and other administrative documents refer only to an SSI application (see, e.g., AR 25, 67-73). Thus, it appears that Plaintiff did not in fact apply for disability insurance benefits. In any event, the Court affirms the finding that Plaintiff is not disabled and thus the type of benefits sought is irrelevant.

1  considering the new evidence, the Appeals Council denied
2  Plaintiff's request for review.  (AR 5-9.)
3  **III. STANDARD OF REVIEW**
4      Pursuant to 42 U.S.C. § 405(g), a district court may review
5  the Commissioner's decision to deny benefits.  The ALJ's findings
6  and decision should be upheld if they are free of legal error and
7  supported by substantial evidence based on the record as a whole.
8  Id.; Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420,
9  1427, 28 L. Ed. 2d 842 (1971); Parra v. Astrue, 481 F.3d 742, 746
10 (9th Cir. 2007).  Substantial evidence means such evidence as a
11 reasonable person might accept as adequate to support a
12 conclusion.  Richardson, 402 U.S. at 401; Lingenfelter v. Astrue,
13 504 F.3d 1028, 1035 (9th Cir. 2007).  It is more than a scintilla
14 but less than a preponderance.  Lingenfelter, 504 F.3d at 1035
15 (citing Robbins v. Soc. Sec. Admin., 466 F.3d 880, 882 (9th Cir.
16 2006)).  To determine whether substantial evidence supports a
17 finding, the reviewing court "must review the administrative
18 record as a whole, weighing both the evidence that supports and
19 the evidence that detracts from the Commissioner's conclusion."
20 Reddick v. Chater, 157 F.3d 715, 720 (9th Cir. 1996).  Moreover,
21 "when the Appeals Council considers new evidence in deciding
22 whether to review a decision of the ALJ, that evidence becomes
23 part of the administrative record, which the district court must
24 consider when reviewing the Commissioner's final decision for
25 substantial evidence."  Brewes v. Comm'r of Soc. Sec. Admin., 682
26 F.3d 1157, 1163 (9th Cir. 2012); see also Taylor v. Comm'r of
27 Soc. Sec. Admin., 659 F.3d 1228, 1232 (9th Cir. 2011).  If the
28 evidence as a whole can reasonably support either affirming or

1  reversing, the reviewing court "may not substitute its judgment"
2  for that of the Commissioner.  <u>Reddick</u>, 157 F.3d at 720-21.
3  **IV.   THE EVALUATION OF DISABILITY**
4        People are "disabled" for purposes of receiving Social
5  Security benefits if they are unable to engage in any substantial
6  gainful activity owing to a physical or mental impairment that is
7  expected to result in death or which has lasted, or is expected
8  to last, for a continuous period of at least 12 months.  42
9  U.S.C. § 423(d)(1)(A); <u>Drouin v. Sullivan</u>, 966 F.2d 1255, 1257
10  (9th Cir. 1992).

11        A.   <u>The Five-Step Evaluation Process</u>
12        The ALJ follows a five-step sequential evaluation process in
13  assessing whether a claimant is disabled.   20 C.F.R.
14  § 416.920(a)(4); <u>Lester v. Chater</u>, 81 F.3d 821, 828 n.5 (9th Cir.
15  1995).   In the first step, the Commissioner must determine
16  whether the claimant is currently engaged in substantial gainful
17  activity; if so, the claimant is not disabled and the claim must
18  be denied.  § 416.920(a)(4)(i).   If the claimant is not engaged
19  in substantial gainful activity, the second step requires the
20  Commissioner to determine whether the claimant has a "severe"
21  impairment or combination of impairments significantly limiting
22  her ability to do basic work activities; if not, a finding of not
23  disabled is made and the claim must be denied.
24  § 416.920(a)(4)(ii).   If the claimant has a "severe" impairment
25  or combination of impairments, the third step requires the
26  Commissioner to determine whether the impairment or combination
27  of impairments meets or equals an impairment in the Listing of
28  Impairments ("Listing") set forth at 20 C.F.R., Part 404, Subpart

4

P, Appendix 1; if so, disability is conclusively presumed and benefits are awarded.  § 416.920(a)(4)(iii).  If the claimant's impairment or combination of impairments does not meet or equal an impairment in the Listing, the fourth step requires the Commissioner to determine whether the claimant has sufficient residual functional capacity ("RFC")[3] to perform her past work; if so, the claimant is not disabled and the claim must be denied. § 416.920(a)(4)(iv).  The claimant has the burden of proving that she is unable to perform past relevant work.  Drouin, 966 F.2d at 1257.  If the claimant meets that burden, a prima facie case of disability is established.  Id.  If that happens or if the claimant has no past relevant work, the Commissioner then bears the burden of establishing that the claimant is not disabled because she can perform other substantial gainful work available in the national economy.  § 416.920(a)(4)(v).  That determination comprises the fifth and final step in the sequential analysis. § 416.920; Lester, 81 F.3d at 828 n.5; Drouin, 966 F.2d at 1257.

B.   The ALJ's Application of the Five-Step Process

At step one, the ALJ found that Plaintiff had not engaged in any substantial gainful activity since July 29, 2009.  (AR 27.) At step two, the ALJ concluded that Plaintiff had the severe impairments of mild degenerative arthritis of the left femur and knee, mild osteoarthritis of the bilateral hands, depressive disorder, and substance abuse in remission.  (Id.)  At step three, the ALJ determined that Plaintiff's impairments did not

---

[3]   RFC is what a claimant can do despite existing exertional and nonexertional limitations.  20 C.F.R. § 416.945; see Cooper v. Sullivan, 880 F.2d 1152, 1155 n.5 (9th Cir. 1989).

1  meet or equal any of the impairments in the Listing.  (AR 29.)
2  At step four, the ALJ found that Plaintiff retained the RFC to
3  perform "light work"[4] except that she was limited to "performing
4  postural activities on an occasional basis," "handling and
5  fingering on an occasional basis," and "simple repetitive work."
6  (AR 30.)  Based on the VE's testimony, the ALJ concluded that
7  Plaintiff was able to perform at least two jobs that existed in
8  significant numbers in the national economy: counter clerk, DOT
9  249.366-010, 1991 WL 672323, and bakery-conveyer-belt worker,
10  524.687-022, 1991 WL 674401.  (AR 32.)  Accordingly, the ALJ
11  determined that Plaintiff was not disabled.  (AR 33.)

12  **V.   DISCUSSION**

13      Plaintiff alleges that the ALJ erred in assessing her mental
14  RFC, physical RFC, and credibility.  (J. Stip. at 4.)

15      A.   <u>The ALJ Properly Assessed Plaintiff's Mental and</u>
16           <u>Physical RFC</u>

17      Plaintiff argues that the ALJ erroneously assessed her
18  mental limitations by omitting from her RFC a limitation that she
19  "could not work around people on a sustained basis."  (J. Stip.
20  at 7.)  Plaintiff also argues that the ALJ erroneously assessed
21  her physical limitations because her RFC failed to accommodate

22  ────────────────

23      [4]   "Light work" involves "lifting no more than 20 pounds
   at a time with frequent lifting or carrying of objects weighing
24  up to 10 pounds."  20 C.F.R. § 416.967(b).  The regulations
   further specify that "[e]ven though the weight lifted may be very
25  little, a job is in this category when it requires a good deal of
   walking or standing, or when it involves sitting most of the time
26  with some pushing and pulling of arm or leg controls."  <u>Id.</u>  A
   person capable of light work is also capable of "sedentary work,"
27  which involves lifting "no more than 10 pounds at a time and
   occasionally lifting or carrying [small articles]" and may
28  involve occasional walking or standing.  § 416.967(a)-(b).

her knee pain, which, she asserts, "limits her ability to stand for long periods." (Id. at 16.)  As discussed below, however, the ALJ properly assessed Plaintiff's mental and physical RFC.

### 1.   Applicable law

In determining disability, the ALJ "must develop the record and interpret the medical evidence" but need not discuss "every piece of evidence" in the record.  Howard v. Barnhart, 341 F.3d 1006, 1012 (9th Cir. 2003) (internal quotation marks omitted). The ALJ is responsible for resolving conflicts in the medical evidence.  Carmickle v. Comm'r, Soc. Sec. Admin., 533 F.3d 1155, 1164 (9th Cir. 2008).  When evidence in the record is susceptible of more than one rational interpretation, the ALJ's decision must be affirmed.  Vasquez v. Astrue, 572 F.3d 586, 591 (9th Cir. 2009).

A district court must uphold an ALJ's RFC assessment when the ALJ has applied the proper legal standard and substantial evidence in the record as a whole supports the decision.  Bayliss v. Barnhart, 427 F.3d 1211, 1217 (9th Cir. 2005).  The ALJ must consider all the medical evidence in the record and "explain in [his] decision the weight given to . . . [the] opinions from treating sources, nontreating sources, and other nonexamining sources."  20 C.F.R. § 416.927(e)(2)(ii); see also § 416.945(a)(1) ("We will assess your residual functional capacity based on all the relevant evidence in your case record."); SSR 96-8p, 1996 WL 374184, at *2 (July 2, 1996) (RFC must be "based on all of the relevant evidence in the case record").  In making an RFC determination, the ALJ may consider those limitations for which there is support in the record and

7

need not consider properly rejected evidence or subjective complaints.  See Bayliss, 427 F.3d at 1217 (upholding ALJ's RFC determination because "the ALJ took into account those limitations for which there was record support that did not depend on [claimant's] subjective complaints"); Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1197 (9th Cir. 2004) (ALJ not required to incorporate into RFC evidence from treating-physician opinions that were "permissibly discounted").

### 2.   Plaintiff's mental limitations

Petitioner contends that "[b]ased on [her] inappropriate displays of anger, and her complaints of difficulty being around people, a reasonable conclusion is that [she] could not work around people on a sustained basis." (J. Stip. at 7.)  Plaintiff argues that the ALJ therefore erred by failing to include such a limitation in her RFC.  (Id.)  Petitioner further contends that her social limitations prevented her from performing one of the two jobs the ALJ found she could perform, and the ALJ did not make a finding that the other job existed in sufficient numbers to establish that she was not disabled.  (Id. at 7-9.)

#### a.   *Relevant facts*

On June 10, 2009, a licensed clinical social worker at the Downtown Mental Health Center ("DMHC") in Los Angeles conducted an adult initial assessment of Plaintiff.  (AR 193-98.) Plaintiff complained of anxiety, depression, anger, irritability, mood swings, forgetfulness, headaches, sleeplessness, auditory hallucinations, and paranoia.  (AR 193; see also AR 203.)  Under "psychiatric history," the social worker noted that Plaintiff "can't be around people [due to] paranoia." (AR 193.)  Under

"mental status evaluation," the social worker noted that Plaintiff was cooperative and oriented, her judgment and insight were minimally impaired, and she denied suicidal ideation.  (AR 197.)  She had average grooming and hygiene, normal eye contact, and appropriate affect but restless motor activity, soft and excessive speech, impaired intellectual functioning, impaired recent memory, below average fund of knowledge, dysphoric and irritable mood, auditory hallucinations, impaired concentration, paranoia, and excessive or inappropriate display of anger.  (Id.)  The social worker diagnosed severe "MDD," or major depressive disorder, "psychotic," and a global assessment of functioning ("GAF") score of 45.[5]  (AR 198.)

On June 19, 2009, a DMHC social worker noted that Plaintiff was "groomed and dressed clean and tidy" and was "talkative and tearful."  (AR 202.)  Plaintiff "report[ed] staying by self as she can't be around people and doesn't trust anyone."  (Id.)  Plaintiff complained of physical pain and "anger, nervous feeling, irritable feeling, no motivation to do necessary things

---

[5]   Previous editions of the Diagnostic and Statistical Manual of Disorders ("DSM") stated that a GAF score represents a rating of overall psychological functioning on a scale of 0 to 100.  See, e.g., Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders, Text Revision 34 (4th ed. 2000). A GAF score in the range of 41 to 50 indicated "[s]erious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  Id.  The GAF score was dropped from the most recent edition of the DSM, however, because of its "conceptual lack of clarity (i.e., including symptoms, suicide risk, and disabilities in its descriptors) and questionable psychometrics in routine practice."  Am. Psychiatric Ass'n, Diagnostic and Statistical Manual of Disorders, 16 (5th ed. 2013).

1    and sleeplessness." (<u>Id.</u>)  On July 1, 2009, a DMHC social worker
2    noted that Plaintiff reported "chronic pain on hands, toes and
3    body"; nightmares; and "continuing depressive feeling, difficulty
4    to focus, difficulty to be around people, mood swings, emotional
5    distress, anger and sleeplessness." (AR 201.)

6        On July 14, 2009, a DMHC social worker noted that Plaintiff
7    reported "continuing depressive feeling, loneliness, absent mind,
8    paranoia, sleeplessness, nervousness, mood swings and
9    irritability" and that she was "staying angry all the time." (AR
10   200.)  That same day, a DMHC doctor completed an initial-
11   medication-support-service report, noting that Plaintiff
12   complained of depressed and irritable mood, forgetfulness,
13   decreased appetite, poor sleep, low energy, anxiety, paranoia,
14   and inability to be in crowds. (AR 205.)  The doctor noted that
15   "contributing factors to [Plaintiff's] current psychiatric state
16   could be [history of] heavy cocaine & [alcohol] abuse." (<u>Id.</u>)
17   Under "mental status," the doctor noted that Plaintiff was
18   "[c]asually dressed & groomed," with good social skills,
19   conversant and worried affect, coherent speech, "grossly intact"
20   memory and concentration, and fair insight, judgment, and impulse
21   control. (AR 206.)  The doctor diagnosed "MDD," or major
22   depressive disorder, with psychotic features, "recurrent,
23   moderate"; history of cocaine and alcohol dependence "in full
24   sustained remission"; and a GAF score of 45. (AR 207.)  The
25   doctor prescribed medication, including an antidepressant and an

1  antipsychotic.[6]  (AR 207, 209.)

2      On August 5, 2009, a DMHC social worker noted that Plaintiff

3  complained that her medication "doesn't help with her sleeping

4  and mood," and she felt "more tired, nervous and fidgetty [sic]."

5  (AR 199.)  Plaintiff reported crying "day and night" and trying

6  to "stay by self during the day to avoid conflict with other

7  people."  (Id.)  Plaintiff reported that she had stopped taking

8  her medication a week earlier and asked for stronger medication,

9  but she said she could "wait until next med appointment on

10 8/13/09."  (Id.)

11     On August 13, 2009, a DMHC doctor noted that Plaintiff

12 reported that she was unable to sleep, irritable, and depressed.

13 (AR 204.)  The doctor noted that Plaintiff "[a]llege[d]

14 compliance" with her medication but had experienced "minimal

15 clinical response."  (Id.)  The doctor found that Plaintiff was

16 well groomed, oriented, cooperative, and pleasant, with "good eye

17 contact & social smile."  (Id.)  She had "no reported perceptual

18 abnormalities except for [p]aranoid ideation."  (Id.)  Plaintiff

19 had "grossly intact" memory and concentration; coherent and

20 fluent speech; and fair insight, judgment, and impulse control.

21 (Id.)  The doctor told Plaintiff to continue her current

22 medications at increased dosages.[7]  (Id.)

23     On October 16, 2009, SSA medical consultant Dr. R.E. Brooks,

24

25     [6]   The doctor listed Plaintiff's medications only as
26 "HDY25," "RPD 0.5," and "STL50" (AR 207) but indicated that the
   type of medication prescribed included an antidepressant and an
27 antipsychotic (AR 209).

28     [7]   The doctor listed Plaintiff's medications as "STL 100,"
   "RPD1," and "HDY50."  (AR 204.)

a psychiatrist,[8] completed a psychiatric-review-technique form. (AR 229-39.)  Dr. Brooks wrote that Plaintiff was "seen at Downtown MHC for a few months but it is not possible to determine [her] ability to function in a work setting from the data in the file."  (AR 239.)  He opined that a consultative examination "was needed to clarify work functionality and [Plaintiff] did not attend."  (Id.)  Dr. Brooks wrote "IE," presumably, insufficient evidence.  (Id.)  On October 19, 2009, medical consultant Dr. Paulette M. Harar, a pediatrician,[9] noted that Plaintiff's whereabouts were unknown and she had failed to report for two medical examinations.  (AR 241.)  Dr. Harar opined that Plaintiff's claim should be denied for insufficient evidence. (Id.)

     Also on October 19, 2009, a DMHC social worker noted that Plaintiff presented with nervousness, depression, and sleep problems.  (AR 248.)  Plaintiff reported that she felt paranoid and did not want to be around crowds of people; she was homeless and stayed with "different friends."  (Id.)  Plaintiff said that she "feels as if her medication does not work and that she is getting more depressed."  (Id.)  The social worker discussed

---

     [8]    Dr. Brooks's electronic signature includes a medical specialty code of 37, indicating psychiatry.  (AR 229); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/ 0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), https://secure.ssa.gov/poms.nsf/lnx/0426510090.

     [9]    Dr. Harar listed a specialty code of 32, indicating pediatrics.  (AR 241); see Program Operations Manual System (POMS) DI 26510.089, U.S. Soc. Sec. Admin. (Oct. 25, 2011), http://policy.ssa.gov/poms.nsf/lnx/0426510089; POMS DI 26510.090, U.S. Soc. Sec. Admin. (Aug. 29, 2012), https://secure.ssa.gov/ poms.nsf/lnx/0426510090.

group therapy, but Plaintiff said she did not want to be around people.  (Id.)  That same day, a DMHC doctor noted that Plaintiff had missed her previous appointment and that she "was prescribed Vicodin for short period, was refused in getting more Vicodin." (AR 247.)  The doctor noted that Plaintiff complained of depressed mood, insomnia, pain, poor appetite, and decreased energy level.  (Id.)  Further, Plaintiff "stated that medications were not effective," but "after detailed questioning" Plaintiff admitted that she was without medication and never refilled her prescriptions after August 13, 2009.  (Id.)  The doctor noted that Plaintiff was well groomed, conversant, and oriented, with good eye contact.  (Id.)  She had a depressed mood and worried affect but linear thought process and content, coherent speech, grossly intact memory and concentration, fair insight and judgment, and no reported perceptual abnormalities.  (Id.)  The doctor noted that Plaintiff had been "[without] active medication for almost 2 months" and instructed her to take her medication regularly.  (Id.)

On February 5, 2010, a DMHC social worker noted that Plaintiff's chart was being closed because "[t]here has not been any activity in [Plaintiff's] case in over 90 days."  (AR 244.) The social worker's discharge diagnosis was major depression with psychotic features and a GAF score of 45.[10]  (AR 245.)

On October 21, 2010, Donna Daley, a marriage and family

_____

[10]    The ALJ's statement that he had received DMHC records "covering the period from June 2009 through February 2011" (AR 28) appears to be in error, as Plaintiff was discharged from DMHC in February 2010 and the file contains no later records from that clinic (see AR 244-45).

therapist at Kedren Community Mental Health Clinic in Los Angeles, noted that Plaintiff "lives with whoever she can" and was "homeless much of the time."[11]  (AR 320.)  She noted that Plaintiff's psychiatric medications included Zoloft and risperdone.[12]  (Id.)  Under "mental status evaluation," Daley noted that Plaintiff's grooming was average and she was oriented, with normal eye contact, average fund of knowledge, calm mood, "culturally congruent" interactional style, appropriate affect, and unimpaired speech, intellectual functioning, and memory.  (AR 321.)  Daley found that Plaintiff had no thought, behavioral, or perceptual disturbances.[13]  (Id.)  Daley diagnosed "MDD," or

---

[11]   Plaintiff submitted the Kedren records to the Appeals Council on September 21, 2011, six months after the ALJ issued his decision.  (AR 318.)  As noted in Section II, the Appeals Council considered the additional evidence but found that it did not provide a basis for reversing the ALJ's decision.  (AR 5-9.)  The Court therefore considers it in determining whether the ALJ's decision was supported by substantial evidence.  See Brewes, 682 F.3d at 1163; see also Taylor, 659 F.3d at 1232.  As Plaintiff acknowledges (J. Stip. at 6), however, the Kedren records, and particularly Dr. Richard O. Kingman's notes, are mostly illegible.

[12]   Zoloft, or sertraline, is an antidepressant used to treat depression, obsessive-compulsive disorder, panic attacks, posttraumatic stress disorder, and social anxiety disorder.  Sertraline, MedlinePlus, http://www.nlm.nih.gov/medlineplus/ druginfo/meds/a697048.html (last updated Apr. 13, 2012).  Risperdone is an antipsychotic used to treat the symptoms of schizophrenia and episodes of mania.  Risperdone, MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/a694015.html (last updated Nov. 15, 2012).

[13]   Respondent states that Daley's notation about perceptual disturbances "could either be 'none apparent' or hallucinations."  (J. Stip. at 11.)  But Daley's imprecise notation most clearly encircles "none apparent" from the list, which is also the most reasonable interpretation given that she did not circle any of the terms indicating the type of

14

1  major depressive disorder, with psychotic features and a GAF

2  score of 46.  (AR 320.)

3       On December 4, 2010, Kedren psychiatrist Richard O. Kingman

4  performed an initial psychiatrist's evaluation of Plaintiff.  (AR

5  322.)  Dr. Kingman appears to have diagnosed posttraumatic stress

6  disorder and either bipolar disorder or major depressive

7  disorder.[14]  (Id.)  He prescribed Abilify, Librium, and

8  Benadryl.[15]  (Id.; see also AR 329.)

9       On December 18, 2010, a Kedren doctor prescribed Cymbalta,

10 trazodone, lithium, and Benadryl.[16]  (AR 328.)  On January 31,

11 ───────────────────

12 hallucinations experienced.  (See AR 321 (listing, under
   "Hallucinations," visual, olfactory, tactile, and "Auditory
13 (command / persecutory / other)," along with space for
   comments).)
14

15      [14]  Though difficult to decipher, Dr. Kingman's second
   diagnosis appears to read "Bipolar D.O. NOS vs. MDD."  (See AR
16 322.)

17      [15]  Abilify, or aripiprazole, is an atypical antipsychotic
   used to treat the symptoms of schizophreniea, bipolar disorder,
18 and depression.  Aripiprazole, MedlinePlus, http://www.nlm.nih.
   gov/medlineplus/druginfo/meds/a603012.html (last updated May 16,
19 2011).  Librium, or chlordiazepoxide, is used to relieve anxiety
   and control agitation caused by alcohol withdrawal.
20 Chlordiazepoxide, MedlinePlus, http://www.nlm.nih.gov/medlineplus
   /druginfo/meds/a682078.html (last updated July 16, 2012).
21 Benadryl, or diphenhydramine, is an antihistamine used to relieve
   allergy and cold symptoms, prevent and treat motion sickness, and
22 treat insomnia.  Diphenhydramine, MedlinePlus, http://www.nlm.
   nih.gov/medlineplus/druginfo/meds/a682539.html (last updated May
23 16, 2011).
24

25      [16]  Cymbalta, or duloxetine, is a selective serotonin and
   norepinephrine reuptake inhibitor used to treat depression,
26 generalized anxiety disorder, and "ongoing bone or muscle pain
   such as lower back pain or osteoarthritis."  Duloxetine,
27 MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds
   /a604030.html (last updated Feb. 15, 2013).  Trazodone is a
28 serotonin modulator used to treat depression.  Trazodone,

2011, Dr. Kingman prescribed Seroquel, lithium, and Benadryl.[17]
(AR 327.)  On April 16, 2011, a Kedren doctor prescribed
Seroquel, lithium, and Benadryl.  (AR 326.)  On May 2, 2011, Dr.
Kingman prescribed Seroquel, lithium, Benadryl, and trazadone.
(AR 325.)  On August 8, 2011, Dr. Kingman prescribed Geodone,
lithium, Benadryl, trazadone, and Cymbalta.[18]  (AR 324.)  On
August 22, 2011, Dr. Kingman prescribed lithium, Benadryl, and
trazadone.  (AR 323.)

            b.  *Discussion*

     The ALJ found that Plaintiff's "depressive disorder and
substance abuse in remission" resulted in an RFC limitation to
"simple repetitive work."  (AR 27, 30.)  In doing so, the ALJ
found that Plaintiff had "moderate difficulties" in
concentration, persistence, and pace.  (AR 29.)  The ALJ also
noted Plaintiff's reports that she "does not want to be around
people and does not want people to bother her" but nevertheless
found that Plaintiff had only "mild difficulties" in social

MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a681038.html (last updated Aug. 1, 2009).  Lithium is an
antimanic agent used to treat and prevent episodes of mania in
people with bipolar disorder.  Lithium, MedlinePlus, http://www.
nlm.nih.gov/medlineplus/druginfo/meds/a681039.html (last updated
Sept. 1, 2010).

     [17]  Seroquel, or quetiapine, is an atypical antipsychotic
used to treat the symptoms of schizophrenia and episodes of mania
or depression in people with bipolar disorder.  Quetiapine,
MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a698019.html (last updated Nov. 15, 2012).

     [18]  Geodone, or ziprasidone, is an atypical antipsychotic
used to treat symptoms of schizophrenia and episodes of mania in
people with bipolar disorder.  Ziprasidone, MedlinePlus,
http://www.nlm.nih.gov/medlineplus/druginfo/meds/a699062.html
(last updated May 16, 2011).

functioning.  (<u>Id.</u>)  In so concluding, the ALJ properly assessed Plaintiff's mental RFC.

As an initial matter, no doctor opined that Plaintiff was unable to interact with people or had other mental limitations exceeding those reflected in her RFC.  Indeed, although several medical providers noted Plaintiff's own reports that she did not want to be around people (<u>see, e.g.</u>, 193, 199, 201-02, 205, 248), in July 2009, a DMHC doctor found that Plaintiff had "good social skills," "conversant" affect, and coherent speech (AR 206), and in August 2009, a DMHC doctor noted that Plaintiff was well groomed, cooperative, and pleasant, with fluent speech, "good eye contact & social smile," and fair insight, judgment, and impulse control (AR 204).  Moreover, the records of Plaintiff's later mental-health treatment, at Kedren, which Plaintiff submitted to the Appeals Council after the ALJ issued his decision, show that Plaintiff had normal eye contact, unimpaired speech, "culturally congruent" interactional style, "calm" mood, and appropriate affect.  (AR 321.)  The assessing social worker noted that Plaintiff had no "behavioral disturbances," and she did not check the boxes to indicate that Plaintiff was aggressive, uncooperative, demanding, demeaning, belligerent, "violent/ destructive," self-destructive, manipulative, or antisocial, nor did she indicate that Plaintiff had "poor impulse control" or "excessive/inappropriate display of anger."  (<u>Id.</u>)  Thus, any finding that Plaintiff was unable to be around people would necessarily be based solely on her subjective complaints, which as discussed in Section V.B below, the ALJ properly discredited. <u>See Bayliss</u>, 427 F.3d at 1217 (upholding ALJ's RFC determination

17

1  because "the ALJ took into account those limitations for which
2  there was record support that did not depend on [claimant's]
3  subjective complaints").

4       Moreover, the ALJ fully summarized and addressed the mental-
5  health evidence that was before him, including Plaintiff's
6  treatment at DMHC and her providers' observations. (See AR 27-
7  29, 31.)  The ALJ also noted that the evidence showed that
8  Plaintiff's psychiatric symptoms improved somewhat with her brief
9  psychiatric treatment at DMHC. (AR 28, 31.)  At Plaintiff's
10 initial DMHC visit, in June 2009, a social worker noted that
11 Plaintiff had auditory hallucinations, "[e]xcessive/
12 [i]nappropriate displays of anger," and impaired concentration,
13 memory, and intellectual functioning. (AR 197.)  In August 2009,
14 however, a DMHC doctor noted that Plaintiff was cooperative and
15 pleasant, with intact memory and concentration and "no reported
16 perceptual abnormalities except for [p]aranoid ideation." (AR
17 204.)  Indeed, at the hearing, when asked to identify her mental
18 symptoms, Plaintiff said, "[n]ot being able to sleep" and did not
19 mention any social difficulties. (AR 51.)  Substantial evidence
20 therefore supports the ALJ's conclusion that Plaintiff's mental
21 issues resulted only in a limitation to simple, repetitive tasks.
22 In any event, even if the evidence was subject to more than one
23 rational interpretation, the ALJ's reasonable findings must be
24 upheld.  See Molina v. Astrue, 674 F.3d 1104, 1111 (9th Cir.
25 2012).

26      The ALJ also noted that Plaintiff failed to follow her
27 prescribed treatment, which would in itself warrant a finding
28 that she was not disabled. (AR 31 (noting that Plaintiff stopped

taking medication and attending treatment and that "the rules
direct a finding of not disabled if an individual fails to follow
prescribed treatment"); 20 C.F.R. § 416.930(b) ("If you do not
follow the prescribed treatment without a good reason, we will
not find you disabled . . . ."). Plaintiff was first seen at
DMHC on June 10, 2009, and was prescribed medication on July 14.
(AR 193-98, 205-09.)  On August 5, 2009, however, a DMHC social
worker noted that Plaintiff complained that her medication wasn't
helping and admitted that she had stopped taking it a week
earlier.  (AR 199.)  Somewhat contradictorily, however, at an
appointment with a DMHC doctor on August 13, 2009, Plaintiff
"[a]llege[d] compliance" with her medication but complained that
she was still irritable, depressed, and unable to sleep.  (AR
204.)  The doctor told Plaintiff to increase the dosage of her
medication.  (Id.)  On October 19, 2009, Plaintiff again claimed
that her medication "does not work" but later admitted, after the
doctor's "detailed questioning," that she actually had not taken
her medication for two months.  (AR 247-48.)  In February 2010,
she was discharged from the clinic after failing to attend for
over 90 days.  (AR 244.)  Plaintiff did not seek mental health
treatment again until October 21, 2010, just a few days before
the ALJ hearing, when she began going to Kedren.  (See AR 49-51,
320.)  The ALJ therefore correctly noted that Plaintiff failed to
follow her prescribed treatment.  Her allegations that it was not
working cannot amount to a good reason for not doing so because
she apparently never complied with her doctor's instruction to
increase the dosages she was taking.

　　　Plaintiff argues that her GAF scores of 45 and 46 establish

19

1  that she had "serious mental symptoms." (J. Stip. at 14; see
2  also AR 198 (GAF score of 45 by social worker); AR 207 (GAF score
3  of 45 by DMHC physician); AR 245 (GAF score of 45 by social
4  worker); AR 320 (GAF score of 46 by therapist).)  But as
5  Plaintiff acknowledges (J. Stip. at 14), the ALJ addressed one of
6  the assigned GAF scores of 45 and rejected it because it was from
7  a "non-medical source" and proved "premature and inaccurate" (AR
8  28).  See 20 C.F.R. § 416.913(a), (d) (therapists and others who
9  are not doctors or psychologists generally considered "other"
10 medical sources).  In any event, even before the DSM discredited
11 them, courts had held that GAF scores "[do] not have a direct
12 correlation to the severity requirements in the Social Security
13 Administration's mental disorders listings," and an ALJ may
14 properly disregard a low GAF score when, as here, other
15 substantial evidence supports a finding that the claimant was not
16 disabled.  See Doney v. Astrue, 485 F. App'x 163, 165 (9th Cir.
17 2012) (alterations and citations omitted); Howard v. Colvin, No.
18 EDCV 12-01633 OP, 2013 WL 1773995, at *8 (C.D. Cal. Apr. 25,
19 2013) (noting that "the Commissioner has no obligation to credit
20 or even consider GAF scores in the disability determination").

21      Plaintiff also contends that the ALJ "erred by failing to
22 send [her] to a psychiatric evaluation after the hearing." (J.
23 Stip. at 9; see also id. at 6-7.)  In determining disability, the
24 ALJ "must develop the record and interpret the medical evidence."
25 Howard, 341 F.3d at 1012.  Nonetheless, it remains the
26 plaintiff's burden to produce evidence in support of her
27 disability claims.  See Mayes v. Massanari, 276 F.3d 453, 459
28 (9th Cir. 2001).  "Ambiguous evidence, or the ALJ's own finding

that the record is inadequate to allow for proper evaluation of the evidence, triggers the ALJ's duty to 'conduct an appropriate inquiry.'"   Tonapetyan v. Halter, 242 F.3d 1144, 1150 (9th Cir. 2001).

Contrary to Plaintiff's contention, nothing indicates that the ALJ failed to fulfil his duty to further develop the evidence.   Plaintiff fails to cite any ambiguous evidence regarding Plaintiff's mental complaints.   (See J. Stip. at 4-9, 13-15.)   And although Plaintiff apparently missed a psychiatric consultative examination that had been scheduled to take place at least a year before the October 2010 hearing (see AR 239 (Dr. Brooks's Oct. 2009 notation that Plaintiff failed to attend consultative examination)), the ALJ never found that such an examination was necessary in order to determine Plaintiff's mental RFC.   Rather, at the hearing the ALJ noted an "absence of records" regarding Plaintiff's "physical concerns" (AR 40), observed that Plaintiff had also missed a consultative examination regarding those problems (AR 41), and said that he would "send [her] out to an internal examination" after the hearing (AR 62; see also AR 41 (noting that he "may send [her] out to be seen by a doctor, perhaps even two doctors after the hearing").[19]   Thus, the ALJ may have found that a consultative examination was necessary regarding Plaintiff's physical complaints, but he did not find that one was necessary to assess her mental condition.

In any event, even if the ALJ's duty to further develop the

_____

[19]     As discussed in Section V.A.3. below, that examination took place on January 8, 2011.   (See AR 295-300.)

record regarding Plaintiff's mental condition had been triggered, he met that duty by instructing Plaintiff's then-attorney to submit within 30 days "any other records from Kedren or any other facility where [Plaintiff] may have obtained recent treatment." (AR 62-63); see Tonapetyan, 242 F.3d at 1150 (ALJ may meet duty to develop record in "several ways," including by "keeping the record open after the hearing to allow supplementation of the record"); Hanbey v. Astrue, 506 F. App'x 615, 616 (9th Cir. 2013) (finding that even if ambiguous records "triggered the ALJ's duty to develop the record, the ALJ fulfilled that duty by according [claimant] the opportunity to supplement the record after the hearing had concluded"). Although the attorney agreed to do so (AR 63), the records apparently were not submitted until September 2011 (see AR 318-29), nearly a year after the hearing and six months after the ALJ's decision.

For all these reasons, the ALJ did not err in finding that Plaintiff's mental issues did not prevent her from performing the jobs of "counter clerk," DOT 249.366-010, 1991 WL 672323, and "bakery conveyer belt worker," DOT 524.687-022, 1991 WL 674401, as the VE testified. (AR 32, 59-62.) But even if, as Plaintiff contends, the ALJ erred by failing to find that Plaintiff could not work around people, that error was harmless. Plaintiff argues that she cannot perform the counter-clerk job because it "requires the temperament of dealing with people," which leaves the bakery-worker job as "the only occupation [Plaintiff] is

22

capable of performing."[20]  (J. Stip. at 7.)  But the ALJ found,
based on the VE's testimony (AR 32, 59-62), that 978 bakery-
worker jobs existed regionally and 11,000 existed nationally,
which, contrary to Plaintiff's contention (J. Stip. at 8), was a
sufficient number to support a nondisability finding at step
five.  See Yelovich v. Colvin, 532 F. App'x 700, 702 (9th Cir.
2013) (finding 900 regional jobs significant number and noting
that Ninth Circuit has "referenced cases finding as few as 500
jobs significant"); cf. Thomas v. Barnhart, 278 F.3d 947, 960
(9th Cir. 2002) (1300 jobs in state sufficient); Meanel v. Apfel,
172 F.3d 1111, 1115 (9th Cir. 1999) (between 1000 and 1500 jobs
in local area sufficient).  Thus, any error was harmless.  See
Molina, 674 F.3d at 1115 (ALJ's error harmless when
"inconsequential to the ultimate nondisability determination"
(internal quotation marks omitted)); Stout v. Comm'r, Soc. Sec.
Admin., 454 F.3d 1050, 1055 (9th Cir. 2006) (same).

    Reversal is not warranted on this ground.

        3.   Plaintiff's physical limitations

    Plaintiff contends the evidence establishes that her knee
pain "limits her ability to stand for long periods." (J. Stip.
at 16.)  Thus, she argues, the ALJ erroneously found that she
could perform "light work," which requires "standing for most of
the workday." (Id.)  Plaintiff also contends that the ALJ failed
to fully and fairly develop the record because the consultative

_____

    [20]    The Dictionary of Occupational Titles states that a
bakery-conveyer-belt worker "[p]erforms any combination of
[listed] tasks in preparation of cakes along conveyor line." DOT
524.687-022, 1991 WL 674401.  In that job, dealing with people is
"[n]ot [s]ignificant" and talking is "[n]ot [p]resent." Id.

23

1   examiner, Dr. Sohelia Benrazavi, assessed her physical condition
2   but failed to provide a functional assessment.  (Id.)

3              a.   *Relevant facts*

4        On July 9, 2009, Plaintiff visited an emergency room
5   complaining of a toothache and pain in her hand, wrist, elbow,
6   shoulder, and knee.  (AR 223.)  The doctor diagnosed a toothache
7   and arthropathy[21] and advised her to follow up with a dentist and
8   internal-medicine doctor.  (AR 224, 226.)  On July 16, 2009,
9   Plaintiff visited the emergency room seeking a refill of her
10  asthma medication.  (AR 220-22.)

11       On August 12, 2009, Plaintiff visited the emergency room
12  complaining of pain in her "whole body."  (AR 227.)  Although
13  largely illegible, it appears the doctor diagnosed asthma,
14  arthritis "r/o RA," depression, and obesity.  (AR 228.)

15       On September 17, 2009, Plaintiff visited the emergency room
16  complaining of hand and upper-extremity pain.  (AR 216-17.)
17  Although largely illegible, it appears the doctor noted deformity
18  of the left hand and swelling of the left upper extremity and
19  prescribed a sling.  (AR 216-18.)

20       On October 29, 2009, Plaintiff visited the emergency room
21  after being assaulted and cut with a knife on her left forearm.
22  (AR 272.)  She received nine stitches.  (AR 277.)  On November
23  18, 2009, Plaintiff visited an ambulatory care center complaining
24  of pain in her hands, arms, and legs.  (AR 278.)  Although
25  largely illegible, it appears Plaintiff was assessed with

26

27

28        [21]    Arthropathy is disease of a joint.  Arthropathy,
    Merriam-Webster, http://www.merriam-webster.com/dictionary/
    arthropathy (last accessed Jan. 14, 2014).

                                  24

"stable" asthma, "DJD," or degenerative joint disease, and a stab wound that was "healing well."  (AR 279.)

On February 5, 2010, Plaintiff visited the emergency room complaining of left-knee pain after a fall.  (AR 282.)  Left-knee x-rays revealed a "Pellegrini-Steida [sic] lesion consistent with subacute or remote MCL injury"[22] and moderate joint effusion and soft-tissue swelling but no fracture or dislocation.  (AR 283.) Left-femur x-rays showed evidence of a prior gunshot wound but no osseous abnormality.  (AR 284.)  X-rays of Plaintiff's left humerus showed an "[o]ld fracture deformity and fracture fragments of the medial and lateral epicondyle and the radial head" and "secondary degenerative change" but "[n]o acute fracture deformity."  (AR 289.)  Plaintiff was diagnosed with contusions of the left knee and thigh.  (AR 281-82.)

On March 17, 2010, Plaintiff visited the emergency room complaining of pain in her low back and left knee.  (AR 286-87.) The doctor's impression is partially illegible but appears to include low-back pain and knee strain.  (AR 286.)

On June 25, 2010, an x-ray of Plaintiff's left knee showed "[s]table Pellegrini-Stieda" that was "related to a prior mediolateral collateral ligament injury" and "[s]table mild degenerative joint disease."  (AR 292.)  A doctor at the orthopaedic clinic diagnosed degenerative changes of the left

---

[22]    Pellegrini-Stieda disease is "a calcific density in the medial collateral ligament and/or bony growth on the medial aspect of the medial condyle of the femur."  See Stedman's Medical Dictionary 519 (27th ed. 2000).

1  knee, administered an injection, and prescribed Celebrex.[23]   (AR

2  294.)

3      On January 8, 2011, consultative examiner Dr. Benrazavi, who

4  was board certified in internal medicine, examined Plaintiff at

5  the Social Security Administration's request.  (AR 295-300.)

6  Plaintiff complained of asthma, knee pain, and osteoarthritis in

7  the hands.  (AR 295.)  She reported that she last had an asthma

8  attack five years earlier.  (AR 295-96.)  Plaintiff said that she

9  had fallen the previous year and hurt her left knee; she was

10  seeing an orthopedic doctor and had received one pain injection.

11  (AR 296.)  Plaintiff said that it hurt when she walked and that

12  her hands "crook up."  (Id.)  Plaintiff's reported medications

13  included lithium, Cymbalta, trazadone, inhalers, Motrin,

14  methocarbamol, and tramadol.[24]   (Id.)  Plaintiff said that she

15  was homeless.  (Id.)

16      Upon examination, Dr. Benrazavi found that Plaintiff had

17

18      [23]    Celebrex, or celocoxib, is an NSAID used to relieve
pain, tenderness, swelling, and stiffness caused by
19  osteoarthritis, rheumatoid arthritis, and ankylosing spondylitis.
Celecoxib, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
20  druginfo/meds/a699022.html (last updated Aug. 15, 2012).

21      [24]    Motrin, or ibuprofen, is used to relieve pain,
tenderness, swelling, and stiffness caused by osteoarthritis or
22  rheumatoid arthritis, as well as minor aches and pains.
Ibuprofen, MedlinePlus, http://www.nlm.nih.gov/medlineplus/
23  druginfo/meds/a682159.html (last updated Oct. 1, 2010).
Methocarbamol is a muscle relaxant used with rest, physical
24  therapy, and other measures to relax muscles and relieve pain and
discomfort caused by strains, sprains, and other muscle injuries.
25  Methocarbamol, MedlinePlus, http://www.nlm.nih.gov/
medlineplus/druginfo/meds/a682579.html (last updated Oct. 1,
26  2010).  Tramadol is an opiate (narcotic) analgesic used to
relieve moderate to moderately severe pain.  Tramadol,
27  MedlinePlus, http://www.nlm.nih.gov/medlineplus/druginfo/meds/
a695011.html (last updated Oct. 15, 2013).
28

normal grip strength in both hands.[25]  (AR 297.)  Ranges of
motion in her shoulders, elbows, wrists, hips, and ankles were
normal.  (AR 298.)  Plaintiff had "[m]ild osteoarthritic changes"
and "a few Heberden's nodes"[26] on her hands, but finger
approximation was intact and she could make a full fist
bilaterally.  (Id.)  Plaintiff had normal range of motion of the
right knee, but on the left she had flexion to 120 degrees with
pain and extension to zero degrees.  (Id.)  Dr. Benrazavi also
noted "some tenderness on palpation of the patella with no
significant swelling or effusion."  (Id.)  Plaintiff had no
atrophy, 5/5 strength in all extremities, intact sensation, and
"2+" reflexes throughout.  (AR 299.)  She used a cane but could
walk without an assistive device, though she had a "slight limp
on the left side."  (AR 297, 299.)  Plaintiff could stand on her
heels and toes momentarily and perform tandem gait.  (AR 299.)
An x-ray of Plaintiff's left hand showed normal alignment,
spurring from the articular margins with "mild joint space
narrowing" of several finger joints, and "[m]inimal changes" of
the thumb joint.  (AR 301.)  The radiologist's impression was
"[o]steoarthritic changes" of several finger joints and a thumb

---

[25]    Dr. Benrazavi found that Plaintiff had grip strength of
"5-5-5" (AR 297), indicating normal strength.  See Strength of
Individual Muscle Groups, Neuroexam.com, http://www.neuroexam.
com/neuroexam/content.php?p=29 (last accessed Jan. 30, 2014).

[26]    Heberden nodes are "exostoses about the size of a pea
or smaller" that are found on the ends of the fingers in
osteoarthritis.  See Stedman's Medical Dictionary 1221 (27th ed.
2000).

1  joint.  (Id.)  An x-ray of Plaintiff's right wrist was normal.[27]

2  (Id.)

3      Under the heading "impression," Dr. Benrazavi wrote that

4  Plaintiff's left-knee range of motion was "mildly diminished,"

5  but "no significant swelling or deformity or effusion" was noted.

6  (AR 299.)  She believed that Plaintiff "did not need to use an

7  assistive device to ambulate."  (Id.)  Dr. Benrazavi noted "mild

8  osteoarthritic changes" of the hands with "a few Heberden's

9  nodes" on the joints, but Plaintiff "was able to make a full fist

10  bilaterally."  (AR 300.)  Dr. Benrazavi noted that Plaintiff's

11  lungs were clear and she had no history of recent emergency-room

12  visits or hospitalizations for asthma.  (Id.)  Under the heading

13  "discussion and functional assessment," Dr. Benrazavi wrote,

14  "[p]lease see medical source statement," but no such statement

15  was attached to her examination report.  (Id.)

16      On May 19, 2011, Plaintiff visited an internal-medicine

17  clinic.[28]  (AR 312-14.)  Although largely illegible, the note

18  appears to include a diagnosis of "DJD," or degenerative joint

19  disease, to be treated with "NSAIDs"; history of depression;

20  nicotine addiction; and history of asthma.  (AR 313.)

21

22

23  [27]  Plaintiff's right-wrist and left-hand x-rays were dated
January 8, 2010, but they were attached to Dr. Benrazavi's
January 8, 2011 report along with a January 8, 2011 vision test.

24  (See AR 295-302.)  Thus, it appears that the x-rays were likely
also conducted on January 8, 2011, not 2010.

25

26  [28]  Plaintiff submitted this record to the Appeals Council
on September 21, 2011 (see AR 310), and the Appeals Council

27  considered it in reviewing the ALJ's decision (see AR 5-9).  The
Court therefore considers it in determining whether the ALJ's

28  decision was supported by substantial evidence.  See Brewes, 682
F.3d at 1163; see also Taylor, 659 F.3d at 1232.

b.   *Discussion*

After summarizing the relevant medical evidence (AR 27-29, 31), the ALJ found that Plaintiff had mild degenerative arthritis of the left femur and knee and mild osteoarthritis of the hands, which resulted in a physical RFC for "light work" with only occasional postural activities, handling, and fingering (AR 27, 30).

Although Plaintiff contends that the RFC is erroneous because she is unable to stand long enough to accomplish light work (J. Stip. at 16), the ALJ's assessment is in fact consistent with the medical record.  X-rays in June 2010 showed only "[s]table Pellegrini-Stieda" related to an old injury and "[s]table mild degenerative joint disease" of the left knee.[29] (AR 292.)  Dr. Benrazavi found only "mildly" diminished range of motion of the left knee and no swelling, effusion, or deformity. (AR 299.)  She noted a "slight limp" on the left but concluded that Plaintiff did not need an assistive device to walk.  (Id.) Plaintiff had 5/5 strength in all extremities, intact sensation, and normal reflexes throughout.  (AR 298-99.)  As the ALJ noted (AR 31), moreover, Plaintiff's physical complaints were treated conservatively, with pain medication and a single knee injection (see AR 294, 296, 313).[30]  Indeed, a limitation on Plaintiff's

---

[29]   The ALJ mistakenly stated that the x-ray finding "stable mild degenerative joint disease" took place in August 2009.  (See AR 27.)

[30]   Although the ALJ did not specifically mention Plaintiff's knee injection, it was consistent with conservative treatment.  Cf. McKnight v. Comm'r Soc. Sec., No. 1:12-cv-00726-AWI-JLT, 2013 WL 3773864, at *9 (E.D. Cal. July 17, 2013) (ALJ properly discounted physician's opinion based on

1   ability to walk or stand would be based almost exclusively on her

2   subjective complaints, which as discussed in Section V.B below,

3   the ALJ properly discredited.   See Bayliss, 427 F.3d at 1217.

4   Because Plaintiff's alleged limitations were not supported by the

5   record, the ALJ did not err by not including them in the RFC.

6   See id.

7       Plaintiff contends that the ALJ failed to fully and fairly

8   develop the record because Dr. Benrazavi's report did not include

9   a functional assessment, which Plaintiff asserts would have been

10  the "most telling portion." (J. Stip. at 16, 18.)  As discussed

11  above in Section V.A.2., at the hearing the ALJ noted an "absence

12  of records" regarding Plaintiff's "physical concerns" and said he

13  would "send [Plaintiff] out to an internal examination." (AR 40-

14  41, 62.)  To the extent the ALJ's findings triggered his duty to

15  develop the record, see Tonapetyan, 242 F.3d at 1150, the ALJ

16  fully satisfied that duty by ordering the consultative

17  examination with Dr. Benrazavi (AR 295-300) and instructing

18  Plaintiff's attorney to "submit updated records" within 30 days

19  (AR 62-63).  See Tonapetyan, 242 F.3d at 1150; Hanbey, 506 F.

20  App'x at 616.  The fact that Dr. Benrazavi did not include a

21  functional assessment does not render her report incomplete or

22  the record inadequate, particularly given that her findings were

23  consistent with other records showing only mild physical

24  impairments.  See 20 C.F.R. § 416.919n(c)(6) ("Although we will

25

26  claimant's positive response to conservative treatment, including
    knee injections and pain medication); Walter v. Astrue, No. EDCV

27  09-1569 AGR, 2011 WL 1326529, at *3 (C.D. Cal. Apr. 6, 2011) (ALJ
    permissibly discounted plaintiff's credibility based on

28  "conservative treatment," including medication, physical therapy,
    and an injection).

1    ordinarily request, as part of the consultative examination

2    process, a medical source statement about what you can still do

3    despite your impairment(s), the absence of such a statement in a

4    consultative examination report will not make the report

5    incomplete."); see also Branum v. Barnhart, 385 F.3d 1268, 1273

6    (10th Cir. 2004) (rejecting plaintiff's argument that ALJ failed

7    to develop record in that consulting psychologist did not provide

8    functional assessment because "[a]lthough the governing

9    regulations provide that a consultative examination report should

10   contain a statement describing . . . the claimant's abilities,

11   despite his or her impairments, to perform certain work-related

12   activities," they "further provide that 'the absence of such a

13   statement in a consultative examination report will not make the

14   report incomplete'" (quoting 20 C.F.R. § 416.919n(c)(6)).)

15        Plaintiff also contends that in assessing her RFC, the ALJ

16   impermissibly "substitut[ed]" his own opinion for Dr.

17   Benrazavi's.  (J. Stip. at 18-19.)  It is true that an ALJ may

18   not substitute his own opinion for a doctor's professional

19   interpretation of clinical testing.  See Day v. Weinberger, 522

20   F.2d 1154, 1156 (9th Cir. 1975) (noting that hearing examiner

21   erred by failing to "set forth any specific reasons for rejecting

22   the . . . doctors' uncontroverted conclusions" and instead making

23   "his own exploration and assessment as to claimant's physical

24   condition" even though he "was not qualified as a medical

25   expert"); Miller v. Astrue, 695 F. Supp. 2d 1042, 1048 (C.D. Cal.

26   2010) ("[I]n noting '[a]t the hearing, the claimant's thoughts

27   did not seem to wander and all questions were answered alertly

28   and appropriately[,]' the ALJ acted as his own medical expert,

1  substituting his opinion for [examining physician's] professional
2  interpretation of the clinical testing, which is improper.").
3  Here, however, the ALJ did not substitute his opinion for a
4  medical expert's; rather, he appropriately considered all of the
5  medical evidence, including Dr. Benrazavi's report, and
6  formulated an RFC that was consistent with it.  (See AR 27-29, 31
7  (summarizing evidence).)  In doing so, the ALJ acted within his
8  authority.  See Vertigan v. Halter, 260 F.3d 1044, 1049 (9th Cir.
9  2001) ("It is clear that it is the responsibility of the ALJ, not
10 the claimant's physician, to determine residual functional
11 capacity."); 20 C.F.R. § 416.946(c) ("[T]he administrative law
12 judge . . . is responsible for assessing your residual functional
13 capacity.").

14        Because the ALJ did not err in assessing Plaintiff's
15 physical RFC, reversal is not warranted on this ground.

16        B.    The ALJ Properly Assessed Plaintiff's Credibility

17        Plaintiff contends that the ALJ failed to give a clear and
18 convincing reason for discounting her credibility.  (J. Stip. at
19 19-22, 26-27.)

20             1.    Applicable law

21        An ALJ's assessment of pain severity and claimant
22 credibility is entitled to "great weight."  See Weetman v.
23 Sullivan, 877 F.2d 20, 22 (9th Cir. 1989); Nyman v. Heckler, 779
24 F.2d 528, 531 (9th Cir. 1986).  "[T]he ALJ is not required to
25 believe every allegation of disabling pain, or else disability
26 benefits would be available for the asking, a result plainly
27 contrary to 42 U.S.C. § 423(d)(5)(A)."  Molina, 674 F.3d at 1112
28 (internal quotation marks omitted).  In evaluating a claimant's

32

subjective symptom testimony, the ALJ engages in a two-step analysis.  See Lingenfelter, 504 F.3d at 1035-36.  "First, the ALJ must determine whether the claimant has presented objective medical evidence of an underlying impairment [that] could reasonably be expected to produce the pain or other symptoms alleged."  Id. at 1036 (internal quotation marks omitted).  If such objective medical evidence exists, the ALJ may not reject a claimant's testimony "simply because there is no showing that the impairment can reasonably produce the *degree* of symptom alleged."  Smolen v. Chater, 80 F.3d 1273, 1282 (9th Cir. 1996) (emphasis in original).  When the ALJ finds a claimant's subjective complaints not credible, the ALJ must make specific findings that support the conclusion.  See Berry v. Astrue, 622 F.3d 1228, 1234 (9th Cir. 2010).  Absent affirmative evidence of malingering, those findings must provide "clear and convincing" reasons for rejecting the claimant's testimony.  Lester, 81 F.3d at 834.  If the ALJ's credibility finding is supported by substantial evidence in the record, the reviewing court "may not engage in second-guessing."  Thomas, 278 F.3d at 959.

### 2.   Relevant facts

In an undated disability report, Plaintiff wrote that her ability to work was limited by arthritis, depression, paranoia, insomnia, and asthma.  (AR 137.)  Her conditions caused her legs to hurt, "crawling leg syndrome," panic attacks, painful hands, and inability to sleep.  (AR 138.)  Plaintiff asserted that she became unable to work because of her conditions on December 1, 1996.  (Id.)

In an undated "Disability Report – Appeal," Plaintiff wrote

1  that her "[c]hronic pain in hands, no sleep and chronic asthma"
2  had changed for the worse on approximately July 30, 2009.[31]  (AR
3  146-47.)  Plaintiff wrote that she had also developed
4  "[r]estlessness in legs and panic attacks," "[h]igh toler[]ance
5  of pain in body," and "[c]onstant body aches."  (AR 147.)  She
6  said that her conditions caused "[c]hronic pain in legs, feet,
7  and hands" and "no sleep."  (AR 150.)

8      At the ALJ hearing on October 25, 2010, Plaintiff testified
9  that she had "been in constant pain for a long time with
10 arthritis" but just "recently" started "going back and forth to
11 the doctors."  (AR 44.)  She testified that her pain was "so
12 excruciating" that she "c[ould]n't even get out of the bed" and
13 was "constantly . . . laying down."  (Id.)  Plaintiff testified
14 that she had constant pain in her hands, legs, back, and toes,
15 with her worst pain in her right hand.  (AR 44, 46.)  She took
16 several medications, including tramadol, celecoxib, and Vicodin,
17 but none of them helped alleviate her pain.  (AR 47, 52.)
18 Plaintiff had fallen on her left leg six months earlier, and a
19 doctor "gave [her] a shot in [her] leg to take the fluid out."
20 (AR 48.)  She said she had a limp and her left leg "goes out"
21 when she walked on it.  (Id.)

22     Plaintiff testified that her hands "constantly ache" and she
23 "can't hardly hold a fork" and "can't hold a cup too long."  (AR
24 48-49.)  It was hard for her to open things because her hands
25 would "get weak."  (Id.)  She said her legs "constantly hurt" and
26 felt "real tired," and as a result it was hard for her to sleep.

27

28     [31]   July 30, 2009 was the day after Plaintiff applied for
SSI.  (See AR 117 (Plaintiff's July 29, 2009 SSI application).)

34

1   (Id.)  Plaintiff testified that her activities were limited by
2   her pain because she had to "constantly just lay down" and would
3   have to "stay laying down for about an hour or two, a long time."
4   (AR 52.)  Plaintiff could sit for five or ten minutes and could
5   stand for about 10 minutes before having to rest.  (AR 52-53.)
6   She could lift "[n]o more than five pounds" and could not "even
7   walk to the corner without taking a break like sitting down and
8   having to breath[e]."  (AR 54-55.)  She said she had a cane at
9   home but had not brought it to the hearing because it was raining
10  and she couldn't carry both a cane and an umbrella.  (AR 54.)

11      Plaintiff testified that she had been receiving mental-
12  health treatment at DMHC but had stopped going the previous
13  February because her "therapist wasn't giving [her] the right
14  medication to help [her] sleep."  (AR 49-50.)  Plaintiff said she
15  had started going to Kedren "a couple of weeks"[32] before the
16  hearing but was not going to see a doctor there until December
17  because "they're so booked up."  (AR 50-51.)  Plaintiff said she
18  had not taken any psychiatric medication for the previous six
19  months.  (AR 51.)  When asked what mental-health symptoms she had
20  been experiencing, Plaintiff said only, "Not being able to
21  sleep."  (Id.)

22          3.  Discussion
23      The ALJ found that Plaintiff's medically determinable
24  impairments could reasonably be expected to produce the alleged
25  symptoms but that her "statements concerning the intensity,
26
27
28      [32]   Kedren records reflect that Plaintiff actually started
    treatment there on October 21, 2010, four days before the
    hearing.  (See AR 320.)

persistence and limiting effects of these symptoms are not
credible to the extent they are inconsistent with" an RFC for a
limited range of light work. (AR 31.) Reversal is not warranted
based on the ALJ's alleged failure to make proper credibility
findings or properly consider Plaintiff's subjective symptoms.

The ALJ permissibly discounted Plaintiff's credibility based
on the "discrepancies between [her] assertions and information
contained in the documentary reports." (Id.); see Carmickle, 533
F.3d at 1161 ("Contradiction with the medical record is a
sufficient basis for rejecting the claimant's subjective
testimony."); Lingenfelter, 504 F.3d at 1040 (in determining
credibility, ALJ may consider "whether the alleged symptoms are
consistent with the medical evidence"); Burch v. Barnhart, 400
F.3d 676, 681 (9th Cir. 2005) ("Although lack of medical evidence
cannot form the sole basis for discounting pain testimony, it is
a factor that the ALJ can consider in his credibility
analysis."); Kennelly v. Astrue, 313 F. App'x 977, 979 (9th Cir.
2009) (same). Indeed, Plaintiff's complaints that the pain in
her legs, feet, back, and hands was so extreme that she had to
"constantly" lie down, could sit for only five or 10 minutes, and
could lift a maximum of five pounds was inconsistent with the
mild findings in her medical records. For example, x-rays of
Plaintiff's left knee showed only "stable" Pellegrini-Stieda
related to an old injury and "mild" degenerative joint disease,
x-rays of her right wrist were normal, and x-rays of her left
hand showed "mild" or "minimal" changes. (AR 292, 301.) Dr.
Benrazavi found that Plaintiff had full grip strength in both
hands; normal ranges of motion in all joints except her left

36

knee, which had only "mildly diminished" range of motion without
swelling or effusion; and normal strength and reflexes
throughout.  (AR 297-99.)  Substantial evidence therefore
supports the ALJ's finding that Plaintiff's complaints were
inconsistent with her medical records.

The ALJ also reasonably discounted Plaintiff's credibility
based on the "degree of medical treatment required."  (AR 31.)
Indeed, as the ALJ noted, Plaintiff received only conservative
treatment for her physical complaints, limited to pain medication
and a single knee injection.  (See, e.g., AR 294 (administering
knee injection and prescribing Celebrex, a NSAID), 296
(Plaintiff's report to Dr. Benrazavi that she took Motrin,
methocarbamol, and tramadol, among other medications), 313
(recommending "NSAIDs" to treat Plaintiff's degenerative joint
disease).)  Such conservative treatment undermines Plaintiff's
complaints of completely debilitating pain.  See Tommasetti v.
Astrue, 533 F.3d 1035, 1040 (9th Cir. 2008) (ALJ may infer that
claimant's "response to conservative treatment undermines
[claimant's] reports regarding the disabling nature of his
pain"); Walter v. Astrue, No. EDCV 09-1569 AGR, 2011 WL 1326529,
at *3 (C.D. Cal. Apr. 6, 2011) (ALJ permissibly discounted
plaintiff's credibility based on "conservative treatment,"
including medication, physical therapy, and an injection).

The ALJ also noted that Plaintiff complained she had been
"experiencing pain for years, but only recently has she been
seeking treatment."  (AR 30.)  Indeed, Plaintiff claimed to have
been in "constant pain for a long time" and disabled since
December 1996 (AR 44, 138, 117), but she testified that she had

just "recently" started "going back and forth to the doctors" (AR
44).  Plaintiff's medical records, moreover, showed only sporadic
treatment for her various physical complaints.  The ALJ also
noted that Plaintiff failed to follow her "prescribed treatment"
(AR 31); indeed, Plaintiff admitted to DMHC providers that she
was not taking her medication and then stopped attending
appointments altogether (see, e.g., AR 199, 247, 244).
Plaintiff's failure to seek treatment or follow prescribed
treatment for her allegedly debilitating conditions undermines
the credibility of her subjective complaints.  See Molina, 674
F.3d at 1112 (in determining credibility, ALJ may consider
"unexplained or inadequately explained failure to seek treatment
or to follow a prescribed course of treatment" (internal
quotation marks omitted)); Orn v. Astrue, 495 F.3d 625, 638 (9th
Cir. 2007) ("[I]f a claimant complains about disabling pain but
fails to seek treatment, or fails to follow prescribed treatment,
for the pain, an ALJ may use such failure as a basis for finding
the complaint unjustified or exaggerated."); SSR 96-7p, 1996 WL
374186, at *7 (July 2, 1996) (claimant's statements "may be less
credible if the level or frequency of treatment is inconsistent
with the level of complaints, or if the medical reports or
records show that the individual is not following the treatment
as prescribed and there are no good reasons for this failure").

     Plaintiff contends that her failure to follow her prescribed
psychiatric treatment was not a clear and convincing reason for
discounting her credibility because she "testified that her
mental health medication and therapist were not helping," and
"[i]t is wrong to expect a claimant to continue a treatment plan

38

1   that does not work." (J. Stip. at 21.) It is true that
2   Plaintiff testified that she had stopped treatment at DMHC
3   because her "therapist wasn't giving [her] the right medication
4   to help [her] sleep" (AR 49), but as discussed in Section V.A.2,
5   it appears that Plaintiff's psychiatric symptoms did improve
6   somewhat with Plaintiff's brief treatment.  Moreover, Plaintiff's
7   medical records show that her complaints that her medications
8   were not working were often coupled with her admissions that she
9   had stopped taking them (see, e.g., AR 199, 247-48), and even if
10  she were justified in stopping treatment at DMHC because of her
11  dissatisfaction with her medication, she failed to give any real
12  reason for waiting eight months to restart treatment with a new
13  provider, at Kedren (see, e.g., AR 49-50 (Plaintiff's testimony
14  that after stopping treatment at DMHC she "didn't even ask
15  around" for a new provider because she "was so kind of hurt
16  behind them giving me the wrong medication")).  Finally, it
17  appears that after Plaintiff complained that her medicines
18  weren't working, the doctor instructed her to increase the amount
19  she was taking, but instead she stopped taking them altogether.
20  (AR 204, 247.)

21      Reversal is not warranted on this ground.
22  **VI.  CONCLUSION**
23      Consistent with the foregoing, and pursuant to sentence four
24  of 42 U.S.C. § 405(g),[33] IT IS ORDERED that judgment be entered
25
26  ──────────
27  [33]   This sentence provides: "The [district] court shall
    have power to enter, upon the pleadings and transcript of the
    record, a judgment affirming, modifying, or reversing the
28  decision of the Commissioner of Social Security, with or without
    remanding the cause for a rehearing."

1  AFFIRMING the decision of the Commissioner and dismissing this
2  action with prejudice.  IT IS FURTHER ORDERED that the Clerk
3  serve copies of this Order and the Judgment on counsel for both
4  parties.
5
6
7  DATED: January 31, 2014
8                                    JEAN ROSENBLUTH
                                     U.S. Magistrate Judge
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

40